J-S18030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| LAMAR RECTOR | : | |
| Appellant | : | No. 989 WDA 2023 |

Appeal from the PCRA Order Entered July 24, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0001674-2004

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| LAMAR RECTOR | : | |
| Appellant | : | No. 990 WDA 2023 |

Appeal from the PCRA Order Entered July 24, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007716-2004

BEFORE:  PANELLA, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED: October 2, 2024**

Lamar Rector appeals from the order dismissing his Post Conviction Relief Act ("PCRA") petition. *See* 42 Pa.C.S.A. §§ 9541-9546. We vacate the order and remand for consideration of the claim that PCRA counsel was ineffective.

A panel of this Court previously summarized the facts as follows:

On October 27, 2003, George Briggs ("Briggs") and his friend Mary Cleavenger ("Cleavenger") drove from Waynesburg, Pennsylvania to pick up a Lincoln automobile, belonging to Briggs, in the Hill District section of Pittsburgh. After picking up the Lincoln at 11:00 p.m., Briggs stopped at a bar on Fifth Avenue. While Cleavenger remained in the car, Briggs went into the bar and ran into an acquaintance, Rector. After having a beer with Rector, Briggs returned to the Lincoln, and went to get gas on Center Avenue. Briggs then returned to Fifth Avenue. While driving past the bar where he had previously met Rector, Briggs noticed Rector, who was flagging Briggs down. Briggs stopped, and Rector asked Briggs if he could drop Rector off at his home on Bentley Avenue. Briggs agreed to do so. Rector then got into the back seat of the Lincoln, behind Cleavenger. When he got into the car, Rector was carrying a carton of Newport cigarettes.

Briggs turned off of Fifth Avenue onto Reed Street, and then onto Lombard Street. While driving along Lombard Street, Briggs lost consciousness. When he awoke, he was under the dashboard, and the Lincoln had crashed into a house. Briggs noticed Rector "rumbling" around in the front seat, where Cleavenger was seated. Briggs grabbed Cleavenger's leg, which was shaking. Briggs then kicked open the driver's side door and saw Rector running up an alleyway toward Lombard Street. Although he didn't see Rector's face, Briggs identified Rector from the jacket he was wearing, which was a three-quarter length black leather jacke[t]. Briggs then got out of the car and walked over to Cleavenger's side of the car.

Briggs noticed a man and woman standing nearby, and the woman came over to help. Briggs then noticed that the back of his head was bleeding. Soon after, the police, fire department, and paramedics arrived. Briggs was taken to the hospital, where it was determined he had been shot in the back of the head. Cleavenger died at the scene of a gunshot wound to the side of her head.

The man and woman Briggs observed near the accident, Djameel Moore ("Moore") and Ashlyn White ("White"), were on Reed Street, coming from a MAC machine, when they observed a black Lincoln drive past. Moore heard a bang, which he thought was a gunshot, and then heard a crash.

- 2 -

Moore and White went up the street and saw a car smashed into the side of a building. Moore saw a person dressed in black open the rear passenger door of the Lincoln, get out, go to the front passenger door, and then run away. Moore described the person who ran away as wearing a black coat, which was a little longer than waist-length. Moore went to a nearby house to call an ambulance.

White testified at trial that as she and Moore were walking from the MAC machine, White heard sounds of gunshots and a car wreck. White went to the car and checked on Cleavenger, who was bleeding.

Police detectives on the scene discovered two spent 9 mm shell casings, one from the rear seat behind the driver and one from the floor of the rear seat on the passenger seat. The detectives observed that Cleavenger had a gunshot entrance wound and an exit wound, and discovered a slug along the bottom of the door frame in the front passenger seat. They also observed a duffle bag and a carton of Newport cigarettes on the back seat.

An autopsy of Cleavenger revealed that she died from a gunshot wound to the head. Cleavenger also had a laceration on one of her fingers, from the same bullet which caused her head wound. A pathologist determined that the finger laceration was a defensive wound. The pathologist also determined that the gun had been discharged six to eight inches away from Cleavenger.

A ballistics expert who examined the two shell casings retrieved from the Lincoln concluded that they had been discharged from the same weapon. The expert also determined that the bullet (slug) that was recovered was consistent with one of the two shell casings. The expert indicated that Cleavenger's left hand was close to the firearm at the time it was discharged, and that the firearm was within six inches of Cleavenger's head when it was discharged.

On November 5, 2003, the police showed Briggs a photo array, from which he identified Rector as the perpetrator. The police brought Briggs to the police department that same day "after receiving some information on persons" that may have been involved in the crime.

On January 31, 2004, the police went to a bar in Pittsburgh, after receiving information that Rector was there. Rector gave the police a false name; however the police were able to confirm that he was Rector, and placed him under arrest.

At the police department, Rector was given **Miranda** warnings. Rector admitted that he was with Briggs on the night of the murder. Rector indicated that Briggs had asked him if he had any drugs, and Rector told Briggs that he could get him some. Rector told the police that he had noticed that Briggs had a large amount of money on him, and stated that he was going to try to get that money by selling Briggs drugs or fake drugs. Upon leaving the bar, Rector purchased a carton of cigarettes from a "junkie." Rector, Briggs, and Cleavenger then drove around but could not find any drugs for sale. At that time, Rector stated that he had forgotten to take his cigarettes. A fingerprint was found of the carton of cigarettes, which matched Rector's fingerprint.

**Commonwealth v. Rector**, No. 1338 WDA 2010, unpublished mem. at 1-4 (Pa.Super. filed August 10, 2011) (citing **Commonwealth v. Rector**, 918 A.2d 790, unpublished mem. at 1-5 (Pa.Super. 2006)) (citations to transcript and footnote omitted).

A jury found Rector guilty of first-degree murder, criminal attempted homicide, aggravated assault, and carrying a firearm without a license. He was sentenced to life without parole on the murder charge and a consecutive term of 20 to 40 years' imprisonment on the criminal attempt charge. Rector filed a direct appeal, and this Court affirmed his judgment of sentence. Rector filed two PCRA petitions, which were both dismissed.

On January 29, 2021, Rector filed the instant counseled PCRA petition requesting a new trial based on newly discovered evidence. He alleged that Briggs recently came forward and claimed, in direct contrast to his testimony

at trial, that Rector was not the person who shot him or Cleavenger on the night in question. *See* PCRA Petition, filed 1/29/21, at 21. Briggs asserted that while he always recalled Rector being in his car that night, he now recalled dropping off Rector somewhere on Elmore Street. *Id.* at 3. He also now recalled that after dropping off Rector, he picked up another black male. *Id.* The last thing Briggs now recalled before being shot was the black male asking him, "Who has some good coke?" *Id.* at 21. Briggs maintained that after the trial, he slowly began to regain memories from the night of the shooting. *Id.* at 3. Briggs stated that these were "[m]emories he couldn't access/retrieve shortly after the shooting and at Rector's trial due to the significant head trauma he suffered." *Id.* In February 2020, Briggs informed Rector's counsel of the exculpatory facts contained in these newly accessed memories. *Id.* at 4. He came forward because "he simply wants to do the right thing because he's one-hundred percent certain Rector wasn't and can't be the gunman because he now recalls dropping Rector off on Elmore Street and picking up the young black man shortly thereafter on Fifth Avenue." *Id.*

The PCRA court scheduled an evidentiary hearing for the limited purpose of determining the timeliness of the petition. At the hearing, Briggs testified that he met with Rector's counsel in February 2020. N.T. PCRA Timeliness Hearing, 6/29/22, at 11. Briggs was incarcerated at the time. *Id.* At the meeting, Briggs informed Rector's attorney of his recantation. *Id.* at 18. Briggs stated that this was the first time he told anyone that Rector was not the shooter. *Id.* at 15, 26, 27. He maintained that he never had any

communication with Rector before this meeting. *Id.* at 12. Briggs stated that he had reached out to Rector's sister in 2016 and 2019. *Id.* at 14, 27-28. He did not inform Rector's sister of his recantation or the substance of his claim, but rather only asked her how he could contact Rector's attorney. *Id.* at 27-30, 34-35. Rector thus maintained that he first learned about Briggs's recantation in February 2020 after the meeting between his counsel and Briggs. Since his PCRA petition was filed within one year of that meeting, Rector argued that his petition was timely.

The court found Rector's PCRA petition timely. *See* Order, 7/7/22, at ¶ 2. It concluded, "[Rector] made a sufficient showing that [his] PCRA petition was filed within one year of learning newly discovered facts upon which the claim is predicated and that those facts were unknown to [Rector] and could not have been ascertained by an exercise of due diligence." *Id.* at ¶ 1.

The court then held an evidentiary hearing on Rector's substantive claim. Rector testified first at the hearing. He denied shooting Briggs on the night in question. N.T. PCRA Evidentiary Hearing, 10/24/22, at 8. He recalled that he was at a bar called Ace's and Deuce's Lounge that night when Briggs approached him. *Id.* at 9-10. Rector said that he and Briggs had a beer together and Briggs asked him if he had any drugs on him. *Id.* at 8. Rector explained that he did not have any drugs on him but said that he knew where Briggs could get some drugs. *Id.* at 8, 10. Rector testified that they then drove to Elmore Square, "circled about once or twice because the neighborhood is like a little circle, and we didn't see anyone and [Briggs] dropped me off and

I went about my business." *Id.* at 9. Rector said that Briggs dropped him off on Elmore Street at his mother's house. *Id.* at 10. He maintained that Briggs and Cleavenger were alive when he got out of Briggs's car. *Id.* at 11.

Briggs testified next at the evidentiary hearing. Briggs acknowledged that he testified at both Rector's preliminary hearing and trial that Rector was the shooter. *Id.* at 19, 25, 31, 32. However, he now believed his previous testimony was incorrect and Rector was not the person who shot him. *Id.* at 19-20, 22. Briggs explained that his memory began to improve a few years after Rector's trial, and he later recalled that he dropped Rector off after driving around with him. *Id.* at 19, 22, 25. He also later recalled that after he dropped Rector off, he picked up another black male. *Id.* at 23. He could not recall the man's name, but he knew him "from the Hill area." *Id.* Briggs stated that this person was the last person he remembered picking up before the shooting. *Id.* at 24. Briggs testified, "I don't remember who shot me, [but] I know [Rector] didn't shoot me, because I remember dropping [Rector] off." *Id.* at 31. Briggs also stated that he has had no communication with Rector or Rector's family and came forward with this information "all on [his] own." *Id.* at 24.

While on the stand, Rector's counsel reviewed Briggs's medical records with him from shortly after the shooting. *Id.* at 34-36. The records showed that Briggs was experiencing "forgetfulness." *Id.* at 35-36. Briggs agreed with counsel that he had memory problems before he testified at the preliminary hearing and at trial. *Id.* Briggs stated that his memory today is "pretty clear,"

but he still takes medicine "off and on" and is under the care of a psychiatrist and a therapist. *Id.* at 41-42.

On July 24, 2023, the court denied Rector's PCRA petition. This appeal followed.

Rector raises the following issues:

I.      Judge Beemer erred because the record contained sufficient facts, evidence, exhibits, and testimony to find — by a preponderance — George Briggs's PCRA testimony credib[le]. U.S. Const. admts. 6, 8, 14; Pa. Const. art. I §§ 1, 6, 9.

II.     Judge Beemer erred because — even if Lamar Rector had attempted to introduce expert testimony regarding George Briggs's memory issues — it would've been inadmissible under Pa.R.Evid. 702 and the case law prohibiting litigants from introducing lay or opinion testimony to vouch for another witness's credibility and/or truthfulness. U.S. Const. admts. 6, 8, 14; Pa. Const. art. I §§ 1, 6, 9.

III.    Based on Judge Beemer's opinion — where he repeatedly criticized Lamar Rector for not introducing expert testimony regarding George Briggs's memory issues — and then used the lack of expert testimony as a substantial factor in finding George Briggs's PCRA testimony incredible — Attorney Cooley was ineffective for not filing a motion seeking funds to retain a memory expert and to present said expert at the October 24, 2023 PCRA hearing. U.S. Const. admts. 6, 8, 14; Pa. Const. art. I §§ 1, 6, 9[.]

Rector's Br. at 4.

Rector first argues that the PCRA court erred when it found Briggs's testimony at the PCRA hearing was not credible. He claims that the court "overlooked, ignored, or dismissed numerous facts in the record that

significantly bolstered Briggs's PCRA testimony." *Id.* at 52. Rector points out that the court failed to give weight to the fact that Briggs, on his own, sought out Rector's family asking them if he could speak to Rector's attorney, and then met with Rector's attorney and told him Rector was not the shooter. *Id.* at 53. Rector also contends that the court failed to consider the fact Briggs had no connection to or relationship with Rector, his family, or his friends before, during, or after trial. *Id.* at 54. Rector maintains that Briggs had entirely no motive to come forward now and testify that Rector was not the person who shot him. *Id.*

Rector further contends that Briggs's description of Rector after the shooting bolters the credibility of his PCRA testimony. *Id.* at 54, 57. Briggs stated that Rector was wearing blue jeans and a three-quarter length leather jacket with suede writing on the left sleeve on the night of the shooting. *Id.* at 55. However, Moore, an eyewitness to the immediate aftermath of the shooting, described the person exiting Briggs's car as a black man wearing all black clothing with a jacket "a little bit underneath the waist." *Id.* at 55-56. Rector argues that these descriptions are of two different people – Briggs described Rector while Moore described the actual gunman. *Id.* at 57. Rector maintains that the discrepancies in the descriptions lend credibility to his testimony that he dropped Rector off and picked up another man on the night of the shooting. *Id.*

Rector further emphasizes that although Briggs could not recall exactly where he dropped off Rector and picked up the other black man, Briggs

"repeatedly testified [at the PCRA hearing] he now recalled the most important memories of this case: (1) the memory of dropping [Rector] off; and (2) the memory of picking up another black man." *Id.* at 57. He notes that Briggs did not waiver on these points during cross-examination. *Id.*

Rector also argues that Briggs's PCRA testimony that he had a drink with Rector at the bar, he then left the bar with Rector, they drove around together, and then he dropped Rector off – in contrast to his trial testimony that he had a drink with Rector at the bar, left the bar alone, and then Rector later "flagged" him down on the streets – is consistent with what Rector has maintained all along, *i.e.*, that he and Briggs left the bar together and got into Briggs's car. *Id.* at 61. Rector therefore argues that Briggs's PCRA testimony was credible because it was consistent with Rector's narrative of the night. *Id.* He also points out he had never seen or been inside Briggs's car before so he could not have "flagged" Briggs down since he did not know what his car looked like, which directly undermines Briggs's testimony at trial and lends credibility to his PCRA testimony. *Id.* at 63-64.

Lastly, Rector points out that while the Commonwealth used Briggs's memory problems to explain away his inconsistencies at trial, the PCRA court failed to give Briggs's memory problems the same consideration at the PCRA hearing. *Id.* at 58-61. He argues that

> while Briggs's level of certainty carried the day at [Rector's]
> trial — and overcame his fragmented memory, the
> numerous inconsistencies, and the absence of any expert
> testimony regarding Briggs's memory issues, Briggs's level
> of certainty at the PCRA hearing about dropping off [Rector]

and picking up another black man didn't carry the same weight and didn't overcome his fragmented memory, lack of specificity, and the absence of expert testimony explaining how Briggs's recollections of that evening could've changed over time due to his traumatic head injury.

*Id.* at 60-61 (emphasis removed).

On appeal from the denial or grant of relief under the PCRA, our review is limited to determining "whether the PCRA court's ruling is supported by the record and free of legal error." **Commonwealth v. Presley**, 193 A.3d 436, 442 (Pa.Super. 2018) (citation omitted). "[W]e must defer to the PCRA court's findings of fact and credibility determinations, which are supported by the record." **Commonwealth v. Spotz**, 84 A.3d 294, 319 (Pa. 2014). This is because "[t]he PCRA court, and not the appellate courts, has personally observed the demeanor of the witnesses[.]" **Id.** "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." **Commonwealth v. Mason**, 130 A.3d 601, 617 (Pa. 2015) (citation omitted).

Any petition for PCRA relief, including second and subsequent petitions, must be filed within one year of the date on which the judgment of sentence becomes final, unless the petitioner pleads and proves an exception to the one-year bar. 42 Pa.C.S.A. § 9545(b)(1). For purposes of the PCRA, "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the

Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* at § 9545(b)(3).

Courts may consider a PCRA petition filed after the one-year deadline only if the petitioner pleads and proves at least one of the three statutory exceptions:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

*Id.* at § 9545(b)(1)(i)-(iii). Any petition attempting to invoke an exception "shall be filed within one year of the date the claim could have been presented." *Id.* at § 9545(b)(2).

Here, Rector's PCRA petition is facially untimely. Rector attempts to invoke the unknown facts exception to the PCRA time bar. To succeed in raising that exception, a petitioner must establish that: (1) "the facts upon which the claim is predicated were unknown" and (2) the facts "could not have been ascertained by the exercise of due diligence[.]" *Id.* at § 9545(b)(1)(ii). "[T]he due diligence inquiry is fact-sensitive and dependent upon the

circumstances presented." ***Commonwealth v. Burton***, 121 A.3d 1063, 1070 (Pa.Super. 2015) (*en banc*). Due diligence "does not require perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances to uncover facts that may support a claim for collateral relief." ***Commonwealth v. Brensinger***, 218 A.3d 440, 449 (Pa.Super. 2019) (*en banc*) (citation and internal quotation marks omitted).

The PCRA court concluded that Rector sufficiently invoked the newly discovered facts exception to the PCRA time-bar and that the unknown facts could not have been ascertained by an exercise of due diligence. ***See*** Order, 7/7/22, at ¶¶ 1, 2. The court did not err. The testimony at the timeliness hearing established that Rector did not know about Briggs's recantation until after Briggs met with his attorney in February 2020. Although Briggs testified that he reached out to Rector's sister in 2016 and 2019, Briggs unequivocally testified that he only told Rector's sister that he wanted to talk to Rector's attorney. He said that he did not disclose to her any other information and that he first came forward with his recantation in February 2020. Rector has been incarcerated since 2005 and did not have an attorney at the time of Briggs's communication to his sister. The record thus supports the PCRA court's conclusion that Rector could not have discovered Briggs's recantation sooner through the exercise of due diligence.

Once a petitioner establishes the PCRA court's jurisdiction under the "new facts" exception, he or she may then present a substantive after-

discovered evidence claim under 42 Pa.C.S.A. § 9543(a)(2)(vi). *Commonwealth v. Reeves*, 296 A.3d 1228, 1232 (Pa.Super. 2023). That subsection provides relief when a petitioner pleads and proves by a preponderance of evidence that the conviction resulted from "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi).

Our Supreme Court has repeatedly recognized that "[r]ecantation testimony is extremely unreliable." *Commonwealth v. Henry*, 706 A.2d 313, 321 (Pa. 1997). The lower court "has the responsibility of judging the credibility of the recantation." *Id.* A PCRA court "as factfinder is in a superior position to make the initial assessment of the importance of [recantation] testimony to the outcome of the case." *Commonwealth v. Medina*, 92 A.3d 1210, 1219 (Pa.Super. 2014) (*en banc*) (citation omitted, alteration in *Medina*). "[T]he deference normally due to the findings of the [PCRA] court is accentuated where what is involved is recantation testimony[.]" *Id.* (citation omitted). When addressing an after-discovered evidence claim based on recantation testimony, "the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole." *Commonwealth v. Small*, 189 A.3d 961, 977 (Pa. 2018) (quoting *Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004)). "Unless the [PCRA] court is satisfied that the recantation is true, it should deny a new trial." *Id.* (quoting *Henry*, 706 A.2d at 321). "An appellate court may not

disturb the trial court's determination absent a clear abuse of discretion."
*Henry,* 706 A.2d at 321.

Here, the PCRA court found Briggs's recantation testimony was not credible and was unlikely to result in a different verdict if a new trial were granted. *See* PCRA Court Opinion, filed 7/24/23, at 9-10. The court explained:

> Briggs testified at the PCRA evidentiary hearing that his testimony is due to regained memories, and that his memory issues, then and now, are a result of the 2003 shooting. Although Briggs testified that he is under doctor's care, no recent medical records or expert testimony were produced at the hearing describing any diagnosis, treatment, and/or how the injury from 2003 would have impacted his memory to explain his recent testimony. Of note, the only medical records admitted during the hearing were from his initial treatment in 2003. His testimony on October 24, 2022, nearly 19 years after the date of the shooting, was uncertain at best and reflected a person who lacks a clear recollection of the events. Briggs could not recall the date of the shooting or the majority of his prior testimony that led to the conviction of [Rector]. Nor could Briggs provide specific and identifiable details relevant to his new testimony, critical to demonstrating that [Rector] was not in the car when the shooting occurred on October 28, 2003. Briggs was unable to recall the location where he dropped off [Rector], nor could he provide any meaningful description of the person who *may* have shot him. When asked, Briggs stated that he had seen this person several times before but could not provide a name or physical description of the person other than to describe him as a black male.
>
> The Court does not believe that George Briggs was being deceptive during the evidentiary hearing, however, the testimony lacked the detail and clarity to allow the Court to find him credible. Moreover, [Rector] did not offer recent and/or adequate support to explain how or why the injury suffered by Briggs could result in a change in his recollection. Instead, [Rector] relied on Briggs's own description of his medical condition(s) to explain how the

injury from the shooting has affected his recollection of the events that occurred on October 28, 2003. This coupled with the undisputed facts presented at trial, including [Rector's] own statements and fingerprint evidence on a carton of cigarettes, renders insufficient the proffered recantation evidence presented at the PCRA hearing.

*Id.* (citations and footnote omitted).

The PCRA court, after carefully reviewing Briggs's testimony, made specific credibility determinations. We must defer to the PCRA court's credibility determinations that are supported by the record. *See Spotz*, 84 A.3d at 319. Rector is essentially asking this Court to reweigh the credibility of Briggs's testimony, and to replace the PCRA court's findings with our own, which we cannot do, especially regarding a recantation claim. *See Henry*, 706 A.2d at 321; *Medina*, 92 A.3d at 1219; *Small*, 189 A.3d at 977. Since the PCRA court stated its reasons for not finding Briggs's recantation testimony credible and there is support for them in the record, its credibility findings are binding on this Court. *See Mason*, 130 A.3d at 618. Thus, the court did not abuse its discretion on this issue.

Rector next argues that the PCRA court's opinion suggests that Rector should have introduced a memory expert to support Briggs's credibility. Rector's Br. at 66. He points to the language in the opinion where the court stated that Rector "did not offer recent and/or adequate support to explain how or why the injury suffered by Briggs could result in a change in his recollection" and he instead "relied on Briggs's own description of his medical condition(s) to explain how the injury from the shooting has affected his

recollection of the events that occurred on October 28, 2003." *Id.* (citing PCRA Ct. Op. at 9-10).

Rector, however, maintains that such expert testimony would have been inadmissible under Pennsylvania Rule of Evidence 702 (permitting expert testimony only if it is beyond that possessed by the average layperson). Rector maintains that an expert was not necessary since it is not beyond the knowledge of an average person to understand how a close-range gunshot wound to the head would cause traumatic brain injuries affecting one's memory. *Id.* at 68. Rector maintains that it is "also common knowledge that someone who suffers a traumatic brain injury can — over[]time — regain access to those memories impacted by the traumatic brain injury." *Id.* at 72. Rector further argues that such expert testimony would have been inadmissible because it would have constituted improper vouching. *Id.* at 73. In support, Rector points to case law stating that experts generally are not permitted to testify as to a witness's credibility. *Id.* Rector argues that the "hypothetical memory expert would do nothing more than speak to Briggs's['] credibility — by opining whether his memories were real or unreal artifacts cobbled together from his traumatized brain." *Id.* at 74.

The Commonwealth counters that it believes such expert testimony would have been admissible. Commonwealth's Br. at 35. The Commonwealth argues that "the effect of any specific injury to Briggs on Briggs'[s] long-term memory involved knowledge beyond that possessed by the average layperson, and, for that reason, such testimony would likely not have been

- 17 -

precluded by law at Rector's evidentiary hearing." ***Id.*** The Commonwealth further maintains that if Rector would have found a medical expert who would have testified to the probability that Briggs could suddenly realize that Rector was not the shooter, "the law arguably would not have precluded such a witness on the grounds that he or she would have improperly vouched for the credibility of Briggs'[s] recantation." ***Id.*** at 36. Citing ***Commonwealth v. Walker***, 92 A.3d 766, 788 (Pa. 2014), the Commonwealth argues that "our Supreme Court held that the use of expert testimony with regard to eyewitness identification does not improperly intrude on the fact-finder's credibility determinations." ***Id.***

On this record, this Court is unable determine whether an expert in this case would have been admissible or not admissible. Since Rector did not move to introduce expert testimony at the PCRA hearing, the issue was never before the PCRA court and thus, the court made no decision regarding the admissibility of a memory expert. We are therefore unable to conduct proper appellate review on this issue.

In Rector's final claim, he raises a claim of ineffectiveness against prior PCRA counsel pursuant to ***Commonwealth v. Bradley***, 261 A.3d 381 (Pa. 2021). He argues that if it is determined that a memory expert is admissible, then counsel was ineffective for failing to file a motion seeking funds to retain a memory expert and to present the expert at the PCRA hearing. Rector's Br. at 76.

"[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant." ***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa.Super. 2010). To obtain relief based on a claim of ineffectiveness, a petitioner must establish: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." ***Spotz***, 84 A.3d at 311. Prejudice in this context means that, "absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different." ***Commonwealth v. Velazquez***, 216 A.3d 1146, 1149 (Pa.Super. 2019) (citation omitted).

In ***Bradley***, our Supreme Court held that "a PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal. 261 A.3d at 401. The Court noted that in certain cases, "the appellate court may need to remand to the PCRA court for further development of the record and for the PCRA court to consider such claims as an initial matter." ***Id.*** at 402. "[T]o advance a request for remand, a petition would be required to provide more than mere boilerplate assertions of PCRA counsel's ineffectiveness[.]" ***Id.*** (citation and internal quotation marks omitted). "[W]here there are material facts at issue concerning claims challenging counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded[.]" ***Id.*** (cleaned up).

Appellate courts are not tasked with developing the record or acting as a court of original jurisdiction, but rather "have the ability to grant or deny relief on straightforward claims, as well as the power to remand to the PCRA court for the development of the record." ***Id.*** at 403. Appellate courts do not serve as factfinding courts. ***See Commonwealth v. Shaw***, 247 A.3d 1008, 1017 (Pa. 2021). The PCRA court is "the appropriate — and, indeed, the only — forum for the evidentiary and factual development" of PCRA claims. ***Commonwealth v. Koehler***, 229 A.3d 915, 937 (Pa. 2020).

Here, prior PCRA counsel first raised a claim of his own ineffectiveness in his concise statement of errors raised on appeal. ***See*** Concise Statement of Errors Raised on Appeal, filed 10/10/23, at 12. The PCRA court acknowledged that counsel raised such a claim but failed to address it. ***See*** Statement in Lieu of Opinion, filed 11/28/23, at 2. We find that relief is not plainly unavailable, and Rector's claims are specific challenges to the effectiveness of PCRA counsel's representation and "more than mere boilerplate assertions of PCRA counsel's ineffectiveness." ***See Bradley***, 261 A.3d at 402 (citation omitted). We conclude that the record is insufficient to allow for disposition of the newly raised ineffectiveness claim. We therefore vacate the order denying Rector's petition and remand for the PCRA court to determine in the first instance the claim that present counsel has raised pursuant to ***Bradley***. ***See Commonwealth v. Lawrence***, 309 A.3d 152, 156 (Pa.Super. 2024). The court shall create an evidentiary record and then must decide whether to conduct an evidentiary hearing on the new claim.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/02/2024